AMP, INC.

v.

UNITED STATES of America.

Civ. No. 72–476.

United States District Court,
M. D. Pennsylvania.

Sept. 13, 1979.

Bernard A. Ryan, Jr., Harrisburg, Pa., Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiff.

S. John Cottone, U. S. Atty., Scranton, Pa., F. Gerald Burnett, Trial Atty., Tax Division, U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

Involved in the present action are exclusive patent license agreements between plaintiff AMP and its wholly owned foreign subsidiaries located in the Netherlands, United Kingdom, France and Italy and its affiliated subsidiaries in Mexico, Australia and Puerto Rico.[1] The issue presented is whether payments received by AMP in 1963, 1964, and 1965 from its foreign subsidiaries and affiliates under these agreements constitute "income from sources without the United States" for the purpose of determining AMP's allowable foreign tax credit.[2] This requires deciding whether the payments were royalties or proceeds from a sale. If they were royalties, then they may be used in calculating AMP's allowable foreign tax credit and AMP prevails. If the payments were proceeds from a sale, then they may not be used in calculating the allowable credit unless the sale took place outside the United States. Currently pending before the court are cross motions for summary judgment. Oral argument on the motions was held April 17, 1979 before the undersigned. The parties have agreed that, after the court renders its opinion, they will submit a proposed judgment in the proper dollar amount. Summary judgment will be granted plaintiff in accordance with the following discussion.

AMP is a New Jersey corporation headquartered in Harrisburg, Pa. It is engaged

---

1. Hereinafter all of AMP's foreign subsidiaries and/or affiliates will be referred to as subsidiaries.

2. The Internal Revenue Code grants a tax credit against United States taxes for income and other similar type taxes paid to foreign jurisdictions. *See* 26 U.S.C. § 901. However, the Code also contains a limitation on the amount of tax credit allowed, see infra. It is the amount of this limitation which is at issue.

in the manufacture of electrical connecting devices and related application machinery. In the years in question it conducted substantial manufacturing and marketing operations outside the United States.[3] These operations were carried out through its subsidiaries. AMP owns numerous patents (domestic and foreign) on the products which it and its subsidiaries manufacture and sell. Prior to 1963 it granted to its subsidiaries *nonexclusive* licenses for patents in the subsidiaries' respective countries. Generally, in return for the licenses, payments were made to AMP of a percentage of net sales of goods manufactured under the patents. On December 31, 1962 AMP and its subsidiaries entered into new agreements.[4]

Under these new agreements the subsidiaries were granted *exclusive* licenses for the life of the patents in their respective countries.[5] Payments were still to be made according to a percentage of net sales of goods manufactured under the patents (generally 5%). The agreements provided that AMP had the right to terminate if the subsidiary failed to make its payments[6] or if it became insolvent or bankrupt. Otherwise, the new agreements, in effect, transferred all substantial rights under the patents.[7] All the agreements stated that they were made in Harrisburg, Pennsylvania and, except as to the contract with the Dutch subsidiary, that they were to be construed according to the laws of Pennsylvania.[8]

## DISCUSSION

Under the Internal Revenue Code (Code) United States residents and domestic corporations are subject to United States tax on worldwide income. But, because of the desire to avoid double taxation on income earned abroad and, secondarily, to encourage American foreign trade, *see Commissioner of Internal Revenue v. American Metal Co.*, 221 F.2d 134 (2nd Cir. 1955), *cert. denied*, 350 U.S. 829, 76 S.Ct. 61, 100 L.Ed. 740 (1955), the Code grants a tax credit on taxes paid to foreign jurisdictions.[9] *See* note 2 *supra*. However, apparently in order to, inter alia, compensate for the fact that foreign jurisdictions may tax at a different rate, the Code contains a limitation on the allowable foreign tax credit. This limitation is found in 26 U.S.C. § 904(a), which, for the years in question, read:

(2) *Overall Limitation*

In the case of any taxpayer who elects the limitation provided by this paragraph, the total amount of the credit in respect of taxes paid or accrued to all foreign countries and possessions of the United States shall not exceed the same proportion of the tax against which such credit

---

3. It appears that AMP is still engaged in such operations.

4. The agreement with the Puerto Rican subsidiary actually was entered into in 1961 and amended in 1964.

5. Although not in issue here, it appears that the change in the licensing agreements resulted from certain changes in the tax laws, effective as of 1963. The relevant new laws no longer permitted AMP to claim indirect foreign tax credits under the old arrangements and also required ordinary income treatment for gains from the sale after 1962 of a patent from a domestic corporation to its controlled foreign subsidiary. 26 U.S.C. § 1249. Hence, AMP apparently structured the new agreements in an attempt to maximize its tax position under the relevant old and new laws.

6. The payments are designated as royalties in the agreements.

7. Plaintiff states that it retained title to the patents. *See* Doc. 37, Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, at 3. Defendant, on the other hand, has in effect assumed that title passed under the agreements, see *infra*. My decision does not rest on whether title to the patents technically passed from the licensor to the licensees, or from seller to buyers. Furthermore, it has been held that passage of title does not preclude the existence of royalties. *See General Aniline & Film Corp. v. Commissioner of Internal Revenue*, 139 F.2d 759 (2nd Cir. 1944).

8. Apparently, the Dutch courts would apply their own law regardless of the recital in the agreement.

9. Subsequent to the years in question here, § 901 was amended. However, it is still unchanged with reference to the issue before the court.

is taken which the taxpayer's taxable income from sources without the United States (but not in excess of the taxpayer's entire taxable income) bears to his entire taxable income for the same taxable year.[10]

In other words, one determines the limitation by dividing income from sources without the United States by total worldwide income and multiplying that fraction against the United States tax on total worldwide income. In its returns for the years 1963, 1964, and 1965, AMP treated the payments received from the subsidiaries under the exclusive license agreements as foreign source income (from without the United States) and, therefore, included them in the numerator of the § 904(a)(2) fraction. This treatment was disallowed by the Internal Revenue Service and taxes owed plus deficiency interest were assessed. AMP paid the proposed assessments, filed claims for refunds, and after the lapse of six months within which the claim, was not acted upon, commenced the present action.

■ In determining whether income is from "sources without the United States," the United States Treasury Regulations state that the principles of 26 U.S.C. §§ 861–864 (Determination of Sources of Income) shall govern.[11] Treas.Reg. § 1.901–2(d), T.D. 6275, 1957. Here, the applicable section is 862, which in pertinent part reads:

> Income from sources without the United States. (a) Gross Income from sources without the United States:
>
> The following items of gross income shall be treated as income from sources without the United States: . . . (4) rentals or royalties from property located without the United States or from any interest in such property, including rent-

als or royalties for the use of or for the privilege of using without the United States patents, . . . (6) gains, profits, and income derived from the purchase of personal property within the United States and its sale without the United States.

Defendant's basic argument is (1) the grant of an exclusive right to manufacture, use, and sell the products under a patent constitutes a sale of that patent for foreign source income purposes. It is asserted that this is true regardless of the mode of payment and that it is borne out by the fact that the transactions in question have been treated as a sale for capital gains purposes. Therefore, according to defendant, the payments in question are not royalties under 26 U.S.C. § 862(a)(4), but are proceeds from sales. And (2) since a patent is personal property its sale, for source of income purposes, is governed by 26 U.S.C. § 862(a)(6), *supra*. It is asserted further that, in determining where the sale took place, the relevant inquiry is the place where title passed and that this inquiry is controlled here by the exclusive license agreements themselves which were last signed by AMP in Pennsylvania and which recited that they were made in Harrisburg, Pa. Therefore, defendant argues, title passed in the United States. Plaintiff counters by contending that (1) a royalty is a payment for use of a patent and since payments here are totally dependent on use, i. e., they are based on a percentage of sales, they must be regarded as royalties; (2) even if the payments are proceeds from a sale, they are still a foreign source of income; and (3) even if the place of technical passage of title is controlling at least to the European subsidiaries, the titles passed outside the United States.[12]

---

**10.** A taxpayer could also have chosen a per country limitation. AMP chose the overall limitation.

**11.** Neither party questions that these sources of income principles should govern the present controversy. The Secretary of Treasury has the authority to promulgate rules and regulations for the enforcement of the income tax laws. 26 U.S.C. § 7805. These rules and regulations are to be upheld if they implement the

Congressional mandate in some reasonable manner. *See United States v. Cartwright*, 411 U.S. 546, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973).

**12.** Most of the negotiating in regard to the agreements with the European subsidiaries took place in Europe and AMP alleges that these agreements were, in effect, entered into there. AMP admits that as to the non-European subsidiaries, the agreements were entered into in the United States.

In analyzing the issues here, it must be remembered that, as stated, the major point of the foreign tax credit is to relieve taxpayers of the burden of double taxation where income subject to United States tax is also taxed by foreign jurisdictions. At the oral argument, in response to a question from the court, defense counsel stated that AMP had paid foreign taxes for the years in question, presumably on the income received under the exclusive license agreements. Hence, plaintiff would be subject to double taxation if defendant's position is sustained. This fact, standing alone, does not, of course, automatically entitle plaintiff to relief, for the allowance of the credit must be authorized by the tax laws. Nevertheless, although ordinarily a tax issue is analyzed in light of the principle that Congress intends to use its powers to its full extent, tax that which it may, and therefore, impliedly, maximize the amount of taxes owed, *see Commissioner of Internal Revenue v. Wodehouse*, 337 U.S. 369, 378–380, 69 S.Ct. 1120, 1124, 93 L.Ed. 1419 (1949), here the issue should be analyzed in light of the fact that the purpose of the foreign tax credit provisions is to lift the burden of double taxation. *See Commissioner of Internal Revenue v. American Metal Co.*, 221 F.2d 134 (2nd Cir. 1955), *cert. denied*, 350 U.S. 829, 76 S.Ct. 61, 100 L.Ed. 740 (1955); *Marsman v. Commissioner of Internal Revenue*, 205 F.2d 335 (4th Cir. 1953).

The first question to be met is whether the payments under the agreements are royalties or proceeds from sales. If they are royalties, AMP must prevail. If not, as previously noted, it must be determined where the sale took place. A logical starting point here is with a determination as to what a royalty normally is.[13] Royalty is defined as:

> . . . A duty or compensation paid to the owner of a patent or copyright for the use of it or the right to act under it, usually at a certain rate for each article manufactured, used, sold, or the like:

Webster's New International Dictionary unabridged 2178 (2nd ed. 1947)

or:

> A payment reserved by the grantor of a patent and payable proportionately to the use made of the right by the grantee. . . . A payment which is made . . . to an inventor in respect of each article sold under the patent.

Black's Law Dictionary 1496 (rev. 4th ed. 1968). It has been stated that a sale, as opposed to a transfer involving royalties, occurs when one conveys a right absolutely to another under terms of payment which do not depend on future use by the transferee. *See Commissioner of Internal Revenue v. Wodehouse*, 337 U.S. at 424, 69 S.Ct. at 1146 (J. Frankfurter, dissenting). Also, *see Cory v. Commissioner*, 230 F.2d 941, 944 (2nd Cir. 1956), *cert. denied*, 352 U.S. 828, 77 S.Ct. 43, 1 L.Ed.2d 50 (1956). Hence, given the normal meaning of the word royalty, and in light of the above statement, it appears to the court, since the payments under the exclusive license agreements are totally dependent upon the use of the patents that, generally speaking, these payments are royalties. Nevertheless, in the morass of the United States tax laws, it may not necessarily follow that the payments are, therefore, royalties for source of income and foreign tax credit purposes.

As stated *supra*, AMP has received capital gains treatment in regard to the payments received under the exclusive license agreements. In order for payments pursuant to a transfer to qualify for capital gains treatment, there must be a sale. *Cf. Goldsmith v. Commissioner of Internal Revenue*, 143 F.2d 466 (2nd Cir. 1944), *cert. denied*, 323 U.S. 774, 65 S.Ct. 135, 89 L.Ed. 619 (1944). It has been held that a transfer of all substantial rights in a patent qualifies that transfer as a sale for capital gains purposes. *See E. I. duPont de Nemours and Company v. United States*, 432 F.2d 1052 (3rd Cir. 1970); *Merck & Co. v. Smith*,

---

13. The parties have not directed the court to any definition of the term royalty in the Code or the regulations promulgated thereunder, nor has one been found. The regulations promulgated under § 862(a)(4) basically track the statute. Treas.Reg. § 1.862(a)(4), T.D. 6500, 1960.

261 F.2d 162 (3rd Cir. 1958). Here, since I believe that plaintiff has transferred all substantial rights in the patent, it would appear that treating the transfer as a sale for capital gains purposes is appropriate under the new laws. Defendant argues that the fact that all substantial rights have been conveyed also qualifies the transaction as a sale for source of income and foreign tax credit purposes. I cannot agree.

To begin with, the same words may have different meanings, dependent on where they are found in the Code. *See Don E. Williams v. Commissioner of Internal Revenue*, 429 U.S. 569, 97 S.Ct. 850, 51 L.Ed.2d 48 (1977). Moreover, it has been previously held in an action dealing in part with whether certain payments were royalties, or proceeds from a sale, that the concepts employed in determining whether a transaction was a sale for capital gains purposes were not necessarily pertinent in deciding a source of income problem. *See Rohmer v. Commissioner of Internal Revenue*, 153 F.2d 61 (2nd Cir.), cert. denied, 328 U.S. 862, 66 S.Ct. 1367, 90 L.Ed. 1632 (1946). And *see Cory v. Commissioner*, 230 F.2d 941 (2nd Cir.), *cert. denied*, 352 U.S. 828, 77 S.Ct. 43, 1 L.Ed. 50 (1956). Additionally, whether a transaction involves a sale for capital gains treatment is an issue dealing with the appropriate rate at which the proceeds should be taxed. It has no relevance in terms of whether the proceeds are foreign source income. Nor can the court perceive of any unfairness inherent in the proceeds being considered as foreign source income for tax credit purposes and, at the same time, qualifying for capital gains treatment.[14] And other decided cases have in part implied that royalties could be taxed at capital gains rates, even though under defendant's analysis if a payment is a royalty it could not qualify as proceeds from a sale. For instance, *see Merck & Co. v. Smith*, 261 F.2d at 164, n.7, where the court stated that the fact that payments were royalties did not prevent them from being taxed at capital gains rates. Also in *Commissioner of Internal Revenue Service v. Wodehouse*, 337 U.S. at 391, 69 S.Ct. at 1130, the Court implied that payments which were being construed as royalties for the purpose of determining their source and taxability, might be taxable at capital gains rates.[15] Furthermore, if the licenses here were non-exclusive and the payments did not qualify as proceeds from a sale for capital gains treatment, it is obvious that defendant would no longer claim the payments were not royalties and foreign source income. But no reason which I find persuasive has been advanced which would justify the distinction between exclusive and non-exclusive being the determining factor in deciding whether the payments are royalties. Lastly, although the court is unaware of any relevant cases dealing with both sources of income and the foreign tax credit sections, I believe that the limited case law does support the conclusion that the payments in question here were royalties.[16] *See Bloch v. United States*, 200 F.2d

---

14. It may be "unfair" that a corporation can receive capital gains treatment for proceeds from a "sale" of a patent to a controlled subsidiary. That possible unfairness may have prompted the addition to the tax laws referred to in n.5 *supra*. However, it would not be appropriate to disallow the payments from being classified as foreign source income for tax credit purposes, assuming that classification is proper, because of dissatisfaction with the rate at which these payments are taxed.

15. In *Wodehouse* the issue was whether certain advance lump sum payments to a nonresident alien in return for exclusive serial or book rights were taxable. The question was, in part, whether the sums received represented royalties or proceeds from the sale of the copyright. The issue arose because under the Internal Revenue Act of 1936 gains from sales of personal property within the United States by nonresident aliens were nontaxable, whereas gains which were royalties were taxable. Prior to 1936 both types of income were taxable, but royalties were subject to withholding at the source, whereas gains from the sales of personal property were not. *Wodehouse*, in effect, held that income which was subject to withholding prior to 1936 was taxable under the new Act. It was decided that the lump sum payments were royalties and would have been subject to withholding prior to 1936.

16. These cases generally deal with whether money earned by nonresident aliens pursuant to a transfer of patent or copyright rights is income from sources within the United States.

63 (2nd Cir. 1952), *cert. denied*, 345 U.S. 935, 73 S.Ct. 796, 97 L.Ed. 1362 (1953) (nonresident alien granted exclusive patent license to United States company in return for a flat fee plus periodic payments based, in part, upon percentage of sales; held that payments were royalties); [17] *but see Commissioner v. Celanese Corp.*, 140 F.2d 339 (D.C.Cir.1944) (payments in return for transfer of patent and based in part on percentage of sales were proceeds from a sale and not subject to withholding at the source); *cf. Commissioner of Internal Revenue v. Wodehouse*, 337 U.S. 369, 69 S.Ct. 1120, 93 L.Ed. 1419 (1949); *Misbourne Pictures Limited v. Johnson*, 189 F.2d 774 (2nd Cir. 1951); *Sabatini v. Commissioner of Internal Revenue*, 98 F.2d 753 (2nd Cir. 1938).

In sum, the payments in question here appear to be royalties, as that term is generally understood and defendant has not proffered any authority which convinces the court that the issue should be decided otherwise. The fact that the transaction qualifies as a sale for capital gains purposes does not alter my conclusion. Furthermore, even assuming that the payments are proceeds from a sale, I still believe that they would qualify as foreign source income.

The relevant section on this issue is 862(a)(6), *see supra*.[18] The parties agree that a patent is personal property.[19]

Treas.Reg. 1.862–1(a)(6), T.D. 6500, 1960 [20] provides that Treas.Reg. 1.861.7(c), T.D. 6500 controls for the purpose of determining the time and place of a sale of

The issue is whether the money is in the form of royalties or proceeds from sales and, accordingly, whether the income is taxable and/or subject to withholding at the source. *See* n.15 *supra*. Although the source of income sections dealing with income from *within* the United States are in pertinent part equivalent to the sections dealing with income from *without* the United States, the issues in the cited cases are different from the question of source of income for foreign tax credit purposes and, hence, there is the problem, as stated *supra*, that concepts and meanings of words are not easily transportable in the United States tax laws. Furthermore, the cases often are concerned with copyrights whose rights are more easily divisible than patents. Still, the cited cases do deal to some extent with the distinction between royalties and proceeds from sales and do arise in the similar source of income framework.

**17.** Defendant states that this case is outmoded in light of *Merck & Co. v. Smith*, 261 F.2d 162 (3rd Cir. 1958). There the court held that the transfer of all substantial rights in a patent was a sale for capital gains purposes. However, I have rejected the argument that because a transaction qualifies as a sale for capital gains purposes, that payments under the transaction cannot be considered as royalties. And indeed, as stated *supra*, *Merck* did in fact consider that the payments might be royalties. Defendant also argues that *Bloch* misread *Wodehouse* because it made a distinction between lump sum payments and payments based on percentage of sales, whereas *Wodehouse* rejected the mode of payment test. And defendant argues generally that since the mode of payment test was rejected in *Wodehouse* that it should not play a part here in determining whether the payments were royalties, but rather the perti-

nent inquiry is whether all substantial rights have been transferred. I cannot agree. *Wodehouse* merely rejected the notion that a lump sum payment could not qualify as a royalty when deciding if the income was taxable. That does not necessarily imply a rejection of the idea that when payments are dependent on the extent to which a patent is used that this mode of payment is relevant when determining whether the payments are royalties, because a lump sum can be a royalty does not mean that a percentage based payment is not in the nature of a royalty. I consider that the mode of payment is very relevant when deciding whether payments are royalties for foreign tax credit and source of income purposes. In point of fact, as in effect stated, it is this factor which generally distinguishes a royalty from other type payments.

**18.** The parties have not discussed whether the requirement that the personal property be bought within the United States has been met, but rather have focused on the requirement that it be sold outside the United States. I assume that the first requirement has been met. It would make no sense to hold that payments were not foreign sourced because both purchase and sale, rather than just the sale, took place outside the United States.

**19.** Although plaintiff points out that a patent, since it only has effect in its country of issue and is not really movable, is not like most personal property.

**20.** That regulation also provides that income from the purchase of property within the United States and its sale within a possession of the United States shall be treated as if derived entirely from within that possession.

personal property. That latter regulation reads, in pertinent part:

> Country in which sold. For the purposes of [part I (section 861 and following), subchapter N, chapter 1 of the Code]', and the regulations thereunder, a sale of personal property is consummated at the time when, and the place where, the rights, title, and interest of the seller in the property are transferred to the buyer. Where bare legal title is retained by the seller, the sale shall be deemed to have occurred at the time and place of passage to the buyer of beneficial ownership and the risk of loss . . . . .

Defendant argues that, 1) based on this regulation, the place where title passed is determinative; 2) since the agreements state on their face that they were made in Pennsylvania, under *Commissioner of Internal Revenue v. Danielson*, 378 F.2d 771 (3rd Cir. 1967), *cert. denied*, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967), AMP may not introduce any evidence to vary that statement and its tax consequences (unless the evidence is of the type which the parties to the agreement could introduce to set aside the contract), and; 3) therefore, title passed in Pennsylvania. At the oral argument, in response to a question from the undersigned, counsel for defendant candidly and properly admitted that under defendant's analysis, if plaintiff's officers made arrangements to travel outside the United States, *e.g.*, to London, for the formality of signing the contract, the proceeds from the sale would qualify as income from without the United States. Furthermore, counsel for the parties were not able to indicate to the court any possible consequence, taxwise (except, of course, possibly as to the issue before the court) or otherwise, which resulted from the contract being signed in Pennsylvania. Nor can the court perceive of any such consequence. Even if signed overseas, the parties could have provided that Pennsylvania law would govern. The controlled subsidiaries would appear to be uninterested in where the contract was entered into.

Plaintiff basically argues that (1) under Treas.Reg. 1.861–7(c), *supra*, since plaintiff has retained bare legal title, the question is where beneficial ownership and risk of loss passed. It is asserted that this would be the situs of the patent and since a patent only has effect in the country under whose laws it exists, the situs must be in that country; (2) it would be inappropriate to apply a place of passage of title test with a patent and under either a situs or overall transaction test, the sale was made without the United States; and (3) even assuming a place of title passage test, at least as to the European subsidiaries, title passed in Europe, where the minds of the parties to the agreements met.

■ It is true that with personal property a sale is generally deemed to take place when and where the seller performs the last act demanded of him to transfer ownership and title passed to the buyer. *See United States v. Balanovski*, 236 F.2d 298, 304–305 (2nd Cir. 1956), *cert. denied*, 352 U.S. 968, 77 S.Ct. 357, 1 L.Ed.2d 322 (1957), and the cases cited therein. It may make sense that when dealing with movable goods the time and place of passage of title should control in determining when and where income is earned. However, it has also been stated that there should not be rigid adherence to this test under all circumstances. *See id.* at 306. And it has been held that an important inquiry is when and where profits are earned. *See Commissioner of Internal Revenue v. East Coast Oil Co.*, 85 F.2d 322 (5th Cir.), *cert. denied*, 299 U.S. 608, 57 S.Ct. 234, 81 L.Ed. 449 (1936). It appears to the court that when dealing with the sale of a foreign patent in the context of the foreign tax credit sections, it makes little sense to insist on applying the place of passage of title test in determining source of income from the sale. Assuming the applicability of Treas.Reg. 1.861–7(c), *supra*, and that it would normally require that source of income of proceeds from a sale of patent should be governed according to where the title to the patent passed, I do not think it should be applied in the situation before the court.

As stated, patents only have effect in the country under whose laws they are issued.

Hence, the patents at issue here only existed outside the United States. All the goods manufactured under the patents are made outside the United States and sold by companies from without the United States, all payments under the agreements come from these companies and the only connection the United States has with these patents and the transactions in question is that AMP is located here and the agreements were formally signed here. A passage of title test based on where the contract was signed would be totally artificial here since the place of signing had no meaningful significance. Therefore, in light of that and given the nature of patents and the specific agreements before the court, I find that, even assuming the proceeds from the exclusive license agreements were proceeds from sales, they still represent foreign source income since the sales took place outside the United States.[21, 22]

21. This holding is obviously restricted to the specific issue before the court, namely the appropriate foreign tax credit limitation.

22. Since I have decided not to apply the place for passage of title test based on where the contract was entered into, it is not necessary to determine whether *Danielson* should be applied and whether, in fact, title technically passed in the United States.