**ITT CORPORATION and Affiliated Companies, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Nos. 84 Civ. 5458 (PKL) to 84 Civ. 5461 (PKL).

United States District Court, S.D. New York.

July 23, 1991.

Kronish, Lieb, Weiner & Hellman, New York City, for plaintiffs; Stephen D. Gardner, Robert A. Kagan, Ann–Elizabeth Purintun and Richard F. Irwin, of counsel.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City, for defendant; Nancy G. Milburn, Asst. U.S. Atty., of counsel.

## OPINION AND ORDER

LEISURE, District Judge.

These are four nonjury tax refund actions for the tax years 1966 through 1969. The parties have filed stipulations of partial dismissal for each case.[1] Currently before the Court are the parties' cross-motions concerning the construction and enforcement of the stipulations for the tax years 1968 and 1969.

## BACKGROUND

Plaintiffs ITT Corporation and its affiliated companies (collectively, "ITT" or "plaintiffs") filed the tax refund actions at issue seeking refunds for income tax paid for the years 1968 and 1969, on the grounds, *inter alia*, that the government improperly characterized some of ITT's gains for those years as ordinary income rather than long-term capital gains.

In 1967 and 1968, ITT entered into a number of forward currency contracts (the "Contracts") with domestic banks, under which ITT agreed to deliver foreign currency to the banks on given dates in the future. Before the delivery date fell due, ITT sold each of the Contracts to a foreign bank. The gains realized on the sales of those Contracts were reported on ITT's 1968 and 1969 income tax returns as long-term capital gains from a foreign source.

The Internal Revenue Service ("IRS") subsequently audited those returns and re-characterized the gains as ordinary income from a domestic source. The explanation given in the Revenue Agent's Report (RAR), issued on October 11, 1974, was that the foreign banks had acted merely as agents for ITT in the delivery of the currency to the domestic banks, and that therefore the transactions between ITT and the foreign banks were not *bona fide* sales, and thus were ineligible for capital gain treatment.

Plaintiffs timely filed refund claims on March 24, 1983. Among other claims for refunds not relevant to the instant motions, ITT stated that as to the Contracts,

> ITT reported long-term capital gains of $4,618,202. The IRS improperly treated these gains as constituting ordinary income on the alleged ground that ITT had not actually sold the contracts to the foreign banks. Rather, the IRS has taken the erroneous position that the foreign banks were acting merely as ITT's agents in making delivery of the currency to the New York banks as required by the contracts. ITT claims that such treatment is incorrect and that the gains realized by ITT are capital gains, not ordinary income. The decrease in tax for the year 1968 for which refund is claimed is $1,062,186.

Declaration of Nancy G. Milburn, dated February 19, 1991 ("Milburn Dec."), Exhibit A, Schedule II at 3; *see also id.*, Exhibit B, Schedule II at 3 (identical language in refund claim for 1969).

Thus, while ITT clearly raised the issue of the proper treatment of the gains as either capital gains or ordinary income (the "capital gain issue"), it made no explicit reference to a dispute over whether the gains were derived from a foreign or domestic source (the "sourcing issue").

In the stipulation for each case, provision is made for the calculation of the total refund due plaintiff for each tax year subsequent to the resolution of all issues in each case.

---

1. The docket numbers for the cases, involving tax years 1966 through 1969 respectively are 84 Civ. 5458 (PKL), 84 Civ. 5459 (PKL), 84 Civ. 5460 (PKL), and 84 Civ. 5461 (PKL). Only the last two cases are implicated in the instant motions.

On August 2, 1984, plaintiffs filed the instant actions in this Court. The language of the complaint for the 1968 tax year concerning the Contracts was as follows:

> The Commissioner improperly disallowed ITT long-term capital gain treatment under Subchapter P of the [Internal Revenue] Code ... and improperly treated such gains as constituting ordinary income, thereby resulting in an improper increase in Plaintiffs' tax by $1,168,405 ($1,062,186 plus 10% surcharge).

Milburn Dec. Exhibit A, Complaint ¶ 12; *see also id.*, Exhibit B, Complaint ¶ 12 (language of complaint for 1969 identical in substance). Thus, the complaints in these actions explicitly raised the capital gain, but not the sourcing, issue.

It is undisputed that ITT's calculations of the amount of refund, in both its original refund claims and its complaints, were based solely on the recharacterization of the gains as capital gains, and did not include any refund based on the sourcing issue. However, plaintiffs assert that the figures were merely tentative and preliminary.

After negotiations and the exchange of correspondence between the parties, stipulations of partial settlement were executed for all four cases, including the 1968 and 1969 cases. *See* JX A–2, JX A–3, JX A–4, JX A–6.[2] The stipulations incorporate by reference eight letters between counsel for the parties, stating in pertinent part:

> It is ... agreed that (1) plaintiff shall be entitled to an overpayment for its taxable year 1968 resulting from the settlement of the forward contracts issue, the terms of which settlement are contained in various correspondence from plaintiff's counsel to the Department of Justice under dates of June 4, 1985, July 17, 1985, February 24, 1987, March 10, 1987 and July 22, 1987, and correspondence from the Department of Justice to plaintiff's counsel under dates of August 28, 1986, May 22, 1987 and July 1, 1987.

JX A–4; *see also* JX A–6 (identical language for 1969).

One of the chief areas of dispute between the parties is whether the correspondence referred to in the stipulations made a resolution of the sourcing issue one of the terms of settlement.

ITT's counsel's letter dated June 4, 1985, refers to an enclosed draft stipulation prepared by ITT on "the foreign exchange contracts capital gain issue." JX B–1. The letter also refers to two enclosed Actions on Decisions ("AODs") issued by the IRS, which according to ITT "indicate that the Government has, in effect, conceded capital gains on the sale of foreign exchange future contracts." *Id.* The enclosed draft stipulation recites the dates, places, and terms of each sale of a Contract, and also the following:

> ITT treated the ... gain from the [1968 and 1969 sales of the Contracts] as long term capital gain from foreign sources in those years. The Commissioner treated such amounts as ordinary income from domestic sources and claimed that "the foreign banks indicated from purchasers, were actually acting as agents for the taxpayer corporation in the delivery of the currency to the New York City banks."
>
> The parties agree that to the extent that the Court determines that the transactions ... were bona fide sale or exchange transactions and not the creation of agency or brokerage relationships for purposes of closing the contracts, then ITT is entitled to *the refund claimed* with respect to such transactions.

JX B–16—B–17 (emphasis added).

ITT's letter dated July 17, 1985, primarily addresses other issues, but also refers to information provided by ITT in response to the government's requests concerning the Contracts. Plaintiff's counsel states that for each Contract, he is enclosing photocopies of documents showing "both the purchase and sales confirmations," as well as lists of "the place of closing and the names of the ITT officials and of the purchaser's

---

**2.** References to the Joint Exhibits submitted by the parties will be to "JX," and will follow the pagination printed at the bottom of the pages of the Joint Exhibits.

representatives who attended the closing and who executed the sales documents." JX C–3.

The August 28, 1986 letter, from Gerald T. Ford ("Ford"), who at the time was the Assistant United States Attorney assigned to these actions, is perhaps the most crucial of these documents in that it contains the government's statement of the proposed settlement terms. It states:

> The terms of the settlement offer are as follows. ITT agrees to concede the allocation of inter-company interest payments issue [a separate issue in the 1968 and 1969 refund cases]. In return, the Government agrees to concede the foreign currency contract issue. If this comports with your understanding of the settlement proposal, please sign in the space below.

JX D–1. Ford further noted that the settlement offer was subject to approval by the Department of Justice. The signature of counsel for ITT appears in the signature space referred to above.

ITT's letter dated February 24, 1987, is a non-substantive cover letter enclosing information on a number of issues in response to inquiries by the Department of Justice Tax Division. The information enclosed in connection with the Contracts was several pages of the RAR. *See* JX E–2, E–3—E–4.

ITT's letter dated March 10, 1987, again to the Justice Department, listed the dates, places and purchasers involved in the sale of each Contract. It goes on to explain that

> [s]ince each sale was a "spot" sale of a forward currency contract, it would have been impossible to have negotiated the terms of the sale prior to the actual closing. (Where the terms of a currency contract sale are negotiated beforehand, the sale is a "forward" sale, not a "spot" sale.) ... [W]hile appointments with the prospective purchasers were undoubtedly made in advance, the negotiations and the terms of the contract could not have

been prearranged before the actual sales were effected at the then current price. JX F–2.

The Justice Department Tax Division's letter to ITT dated May 22, 1987, refers to the settlement terms of the August 28, 1986 letter, restates the concession that each side was to make, and advises plaintiffs that "the proposed partial settlement is being referred to the Joint Committee on Taxation." JX G–1.

The Tax Division's letter to ITT dated July 1, 1987, states:

> We have been advised by the Joint Committee staff that it finds no reasons to offer any adverse criticism to the proposed partial settlement. Accordingly, your offer has been accepted on behalf of the Attorney General. We previously requested the [IRS] to prepare a computation of the overpayments under the proposed partial settlement. Upon receipt of the Service's computation, we will forward it to you for examination.

JX H–1. The letter also enclosed stipulations for partial settlement for all four cases.

ITT's letter dated July 22, 1987, informed the Tax Division that ITT had signed the stipulations for the 1966 and 1967 tax years, and that another issue, not implicated in the instant motions (the "Pennsylvania Glass litigation issue"), had been settled and could be included in the stipulations for the 1968 and 1969 cases. The letter went on to state:

> Your letter indicates that ... the Joint Committee ... has approved a specific refund amount. Because of the complexities of ITT's tax return and the necessary calculations that must be made to determine the amount of, and limitations placed upon, ITT's foreign tax credits, which involve allocations based on income and expense sourcing, no correct amount of refund can be determined with respect to one issue until the entire case is resolved.
>
> In light of these two matters, we have drafted changes to the 1968 and 1969 stipulations which you prepared, which state that the amount of refund due ITT

will be calculated only upon final resolution of the entire case [including two additional then-outstanding issues].

JX I–2.

In the draft stipulations enclosed with this letter, ITT had provided that

a refund on the forward contracts issue shall be allowed the plaintiff based on the acceptance by the defendant of the position taken by the plaintiff *in its return* with respect to such contracts for 1968, thereby rejecting the position taken on pages 14 and 15 of the Revenue Agent's Report of June 16, 1975.... It is further agreed that in determining the amount of final judgment in this case the computation ... shall be made upon final determination of all the issues involved in this case and that such computation shall take into account all appropriate foreign tax credit computations.

JX I–7—I–8 (emphasis added), *see also* JX I–9—I–10 (identical language in draft stipulation for 1969).

The draft stipulations enclosed with ITT's July 22, 1987, letter were never signed, and the government argues that they constituted attempts to alter the terms of the settlement after plaintiffs' offer had been accepted. The stipulations were then redrafted on the terms quoted, *supra,* with few specific terms and with references to the eight letters described immediately above, and were executed in the fall of 1987.

ITT maintains that

in the settlement the Government fully recognized and accepted the position ITT took on its returns on the basis of uncontested facts: because the foreign curren-

cy contracts were sold abroad, the gains realized on those sales are foreign source income. As foreign source income, those gains permit ITT to credit additional foreign taxes against its tax obligations ..., thereby increasing the refunds due ITT in these actions.

Plaintiffs' Memorandum of Law ("Plain. Mem.") at 3.

The government, on the other hand, contends that only the capital gain issue was raised over the entire course of the settlement negotiations until plaintiffs' July 22, 1987 letter, and that the government rejected the inclusion of the sourcing issue in the final version of the stipulations.

## DISCUSSION

### I. *Significance of Sourcing Issue*

The parties generally agree on the implications of the sourcing issue. While the capital gain issue affects the calculation only of plaintiffs' gains on the particular transaction at issue, the sourcing issue has a potential effect on the maximum foreign tax credit allowed against ITT's overall tax liability for 1968 and 1969.

A foreign tax credit is provided in the Internal Revenue Code of 1954[3] (the "Code") to "mitigate the evil of double taxation," *Burnet v. Chicago Portrait Co.,* 285 U.S. 1, 7, 52 S.Ct. 275, 277, 76 L.Ed. 587 (1932), that is, the taxing of income earned abroad by a United States taxpayer by both the United States and the country in which that income was earned. However, the credit is limited by Section 904(a) of the Code. The formula, as described by the government, is as follows:

$$\frac{\text{taxable income from foreign source}}{\text{taxable income from all sources}} \times \begin{matrix}\text{U.S. tax} \\ \text{before} \\ \text{tax credit}\end{matrix} = \begin{matrix}\text{Maximum} \\ \text{foreign tax} \\ \text{credit}\end{matrix}$$

Defendant's Memorandum of Law ("Def. Mem.") at 5 n. *.

Thus, the greater the taxable income from foreign sources, the greater the maximum amount of a taxpayer's foreign tax

3. References to the Code are to the version of Title 26 of the United States in effect during tax years 1968 and 1969.

credit, and the smaller the taxpayer's overall tax liability. Because this calculation cannot be performed until final figures have been prepared for each of the variables, the total refund due ITT for any tax year could not be calculated until the resolution of all outstanding issues in these cases. However, the precise issue litigated in the instant motions is whether ITT's gains from the sale of the Contracts, now concededly calculated as long-term capital gains, may be added to the "taxable income from foreign source" figure that is the numerator of the above fraction.

In figures provided by the parties, exclusive of interest, the consequences of the instant motions for tax year 1968 are as follows: if the government prevails, plaintiffs will be entitled to a refund of $818,155; if ITT prevails, the figure is $2,839.007. For tax year 1969, if the government prevails, plaintiffs' refund will be $343,809; if ITT prevails, the refund will be $1,410,511.

## II. *Failure to Raise Issue in Refund Claims*

■ The government argues that this Court has no jurisdiction over the sourcing issue because of plaintiffs' failure to raise the issue in their original refund claims. "Because the United States is immune from suit unless it consents to be sued, a plaintiff must strictly comply with the statute by which the United States has consented to be sued." *Foyt v. United States,* 561 F.2d 599, 604 (5th Cir.1977). Moreover, in an action seeking an income tax refund, the tax assessment is presumed to be valid, and the taxpayer has the burden of proving its entitlement to the refund. *See Pizzarello v. United States,* 408 F.2d 579, 583 (2d Cir.), *cert. denied,* 396 U.S. 986, 90 S.Ct. 481, 24 L.Ed.2d 450 (1969).

■ The relevant statute in this case requires the filing of a "claim for refund or credit ... with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof," 26 U.S.C. § 7422(a), before any proceeding may be held in court. This requirement is jurisdictional.

*See, e.g., Rosenbluth Trading Inc. v. United States,* 736 F.2d 43, 45, 47 (2d Cir.1984).

The regulations promulgated by the IRS require that a claim "set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the commissioner of the exact bases thereof." 26 C.F.R. § 301.6402–2(b)(1). Courts have held that

[t]he reasons for the rule requiring a taxpayer to state the grounds for his claim are "to prevent surprise ... to give adequate notice to the Service of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination ...," to provide the Commissioner with an opportunity "to correct any errors, and ... to limit the scope of any ensuing litigation to those issues which have been examined...."

*First Nat'l Bank v. United States,* 727 F.2d 741, 744 (8th Cir.1984) (quoting *Union Pac. R.R. v. United States,* 389 F.2d 437, 442, 182 Ct.Cl. 103 (1968)).

Under appropriate circumstances, however, a slight variance from the grounds asserted in the claim for relief may be permitted. "Where the claim for refund states general grounds for relief, an item raised in litigation, but not specifically mentioned in the claim will be permitted if the taxpayer adequately alerted the IRS to the fact that the item is a ground for refund." *Id.* ITT argues that the general language of its refund claim and complaint sufficed to raise the sourcing issue, and that the government has waived its objections to any noncompliance with the regulation.

In *First National Bank,* an issue arose as to whether the plaintiff in that action had raised the issue of the applicability of 26 U.S.C. § 2055(e)(2) to a charitable bequest. The taxpayer had addressed its refund claim to its attempts to comply with 26 U.S.C. § 2055(e)(3), but also made a general statement that it was owed a refund because of the availability of a charitable deduction. Further, in its complaint, plaintiff specifically raised "the entire § 2055 deduction." *Id.* The Court concluded that

the claim for refund "met the required standard for specificity," *id.* at 745, and that, in any case, the government had waived any objection because it had not raised the objection prior to entry of judgment. *Id.*

In an earlier case in which a court rejected the government's argument that a taxpayer was precluded from recovering on a basis not specified in its refund claim, the taxpayer had set forth the factual bases of its newer ground for recovery in its second amended complaint, and "the Commissioner had knowledge of this alternative ground for refund and investigated it for two and a half years before the date of trial." *United States v. Henderson Clay Products*, 324 F.2d 7, 17–18 (5th Cir.1963), *cert. denied*, 377 U.S. 917, 84 S.Ct. 1182, 12 L.Ed.2d 186 (1964). The Court thus found waiver by the government of the requirements of 26 C.F.R. § 301.6402–2(b)(1). *Id.* at 18.

Other cases finding a waiver by the government of a taxpayer's failure to state all of its grounds for recovery in its refund claim have involved an explicit waiver by stipulation, *Tucker v. Alexander*, 275 U.S. 228, 48 S.Ct. 45, 72 L.Ed. 253 (1927), the active litigation of the matter by the government during cross-examination at trial, *United States v. Smith*, 418 F.2d 589, 597–98 (5th Cir.1969) (per curiam), or an invitation to the Court by the government to consider all of the evidence, including that concerning the newly raised ground for recovery, *Foyt, supra*, 561 F.2d at 605.

The Court finds that the case at bar is distinguishable from the cases cited above. The government has never affirmatively waived its objection on this ground, nor has it been tardy in raising the objection, but has asserted it vigorously at the first opportunity. Neither can the Court conclude that the language of either the original refund claims or the complaints in these actions was sufficient to put the government on notice of the sourcing issue. In this regard, the Court notes that the inclu-

sion of only a few words would have constituted clear notice of this ground for relief.

However, if the government actually conducted an investigation into the matter, or the issue was included within the actual terms of the stipulations or the correspondence incorporated therein, then the government will be held to have waived any objection, and the sourcing issue will be considered part of the settlement between the parties.

### III. *Investigation of Sourcing Issue*

ITT asserts that the legal analysis as to whether income derives from a foreign source is straightforward under Code Sections 861(a)(6) and 862(a)(6), such that gains on personal property sold in a foreign country constitute foreign source income. Thus, ITT argues, once the sales of the Contracts had been determined to be actual sales rather than agency schemes, the conclusion that the gains were from a foreign source was automatic. Further, ITT argues that its inclusion of the place of each Contract sale in the information it provided to the government demonstrates that the government investigated the issue.

The government contends that the analysis is more complicated, and distinct from the analysis required for the capital gain issue, which involves an examination of the circumstances of the sales under *La Grange v. Commissioner*, 26 T.C. 191 (1956), and its progeny,[4] particularly whether the sales were prearranged or prenegotiated. *See, e.g., American Home Products Corp. v. United States*, 601 F.2d 540, 546–48, 220 Ct.Cl. 369 (1979). Furthermore, the finding of a "sale" for purposes of capital gains analysis is not necessarily dispositive of any dispute over the facts surrounding the sales for purposes of the sourcing issue. *See AMP, Inc. v. United States*, 492 F.Supp. 27, 32 (M.D.Pa.1979) (same word may have different meanings in different sections of Code); *accord, Don E. Williams Co. v. Commissioner*, 429 U.S. 569, 580–82, 97 S.Ct. 850, 857–58, 51 L.Ed.2d 48 (1977); *Conforte v. Commissioner*, 692 F.2d 587, 591 (9th Cir.1982).

---

**4.** ITT does not contest that *La Grange* is the    seminal case for the capital gain issue.

According to the government, "[i]ncome sourcing is governed by complex source of income rules set forth in Sections 861–863 of the [Code]. The rules relate to such factors as the type of income, the nature of the economic activity which generated the income, the situs of the activity, and residency requirements." Def.Mem. at 16–17 n. *.

Cases cited by the government have noted that the "concepts employed in determining whether a transaction was a sale for capital gains purposes [are] not necessarily pertinent in deciding a source of income problem." *AMP, Inc. v. United States*, 492 F.Supp. 27, 32 (M.D.Pa.1979) (citing cases). The government also points out that the question of where a sale of personal property takes place for source of income purposes is governed by IRS Regulation § 1.861–7(c), which provides that

> a sale of personal property is consummated at the time when, and the place where, the rights, title and interest of the seller in the property are transferred to the buyer. Where bare legal title is retained by the seller, the sale shall be deemed to have occurred at the time and place of passage to the buyer of beneficial ownership and the risk of loss.

While the government "takes no position ... as to what the outcome of an income sourcing analysis of ITT's foreign currency contract sales proceeds for 1968 and 1969 would be," Def.Mem. at 13, it asserts that the investigation it would conduct pursuant to such an analysis would involve facts concerning "passage of title, beneficial ownership and risk of loss issues, or, alternatively, an examination of questions as to when and where profits from the transaction are earned." *Id.* at 14 n. *. Those factors stem from the various tests employed by the courts, the "passage of title test," *see, e.g., United States v. Balanovski*, 236 F.2d 298 (2d Cir.1956), *cert. denied*, 352 U.S. 968, 77 S.Ct. 357, 1 L.Ed.2d 322 (1957), and the "place where the profits from the transaction were earned." *See, e.g., Commissioner v. East Coast Oil Co.*, 85 F.2d 322, 323 (5th Cir.), *cert. denied*, 299 U.S. 608, 57 S.Ct. 234, 81 L.Ed. 449 (1936); *AMP, supra*, 492 F.Supp. at 34–35.

While ITT may be correct that the determination of the sourcing issue would be a simple one under the facts of this case, that is not the question before the Court. Instead, the question is whether it appears that the government actually investigated the issue in sufficient detail to make it clear that it was on notice of that ground for refund and that it waived any objection to the belated raising of the issue.

The Court finds unconvincing plaintiffs' argument that the government actually investigated the sourcing issue. Other cases finding investigation or litigation of an issue by the government have involved clear evidence of such activity. *See, e.g., Henderson Clay, supra*, 324 F.2d at 17–18.

The Court cannot find that the inclusion of the bare fact of the place of closing for the sale of each Contract, even if provided in response to a government inquiry, demonstrates government investigation of the sourcing issue. The place of sale is also clearly one of the factors relevant to the government's investigation into whether the sales were prenegotiated, as part of its analysis of the capital gain issue. Moreover, as discussed, *supra*, the sourcing issue has a potentially large effect on the amount of refund the government must pay to plaintiffs, and thus constitutes a sufficiently important issue to require an inquiry into the factors set forth in *Balanovski, East Coast Oil*, and *AMP*.

## IV. Terms of Settlement

■ "A settlement is a contract, and once entered into is binding and conclusive." *Janneh v. GAF Corp.*, 887 F.2d 432, 436 (2d Cir.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 177, 112 L.Ed.2d 141 (1990); *see also Janus Films v. Miller*, 801 F.2d 578 (2d Cir.1986). In interpreting a settlement agreement, "[a]s with any ... contract, [the court] look[s] first at the plain language of the agreement." *Kohl Indus. Park Co. v. County of Rockland*, 710 F.2d 895, 903 (2d Cir.1983); *see also Janneh, supra*.

ITT argues that, in the draft stipulation of facts enclosed with the letter dated June

4, 1985, the first letter incorporated by reference into the final stipulations, included, as quoted, *supra*, a statement of each party's positions on both the capital gain and sourcing issue in the income tax return filed by ITT and the RAR issued by the government.

The government contends that this statement merely reiterates the background of the case, and notes that it is not bound by the terms of the RAR. *See Cataldo v. United States*, 73-2 U.S.T.C. (CCH) ¶ 9585 at 81,885-86 (S.D.N.Y.1973), *aff'd per curiam*, 501 F.2d 396 (2d Cir.1974). The government also notes that the text of the June 4, 1985, letter itself refers only, and repeatedly, to "the foreign exchange contracts *capital gain issue.*" JX B-1 (emphasis added).

ITT points out a reference to the draft stipulation of June 4, 1985, in the letter of July 17, 1985. However, that reference merely advises the government that the documents provided by ITT had been "numbered to correspond with the draft stipulation." JX C-3.

ITT asserts that the terms of the settlement, set forth in the letter dated August 28, 1986, which refer to the government's concession of "the foreign currency contract issue," JX D-1, include the government's "full knowledge that ITT had made foreign sales that resulted in foreign source income," Plain.Mem. at 16, based on the two earlier letters. However, this conclusion is simply unsupported by the documents comprising the parties' agreement.

Despite ITT's statement in its first memorandum of law submitted with its motion that the "remaining letters ... do not change the agreed settlement[ ] [b]ut they do involve further inquiries by the Department of Justice ... to assure ... that the foreign sales were real sales and not mere agency transactions," *id.*, ITT argues in its reply brief that "[e]ven if ITT's initial offer did not include as one of its terms the Government's concession as to source, then that offer was amended to include such a concession, and the Government, on July 1, 1987, accepted the amended offer." Plain.Reply at 11.

ITT directs the Court's attention to the terms of a draft stipulation prepared by ITT and enclosed with a letter dated October 24, 1986. Plaintiffs' Exhibits 1, 2. However, the October 24, 1986, letter is conspicuously absent from the correspondence incorporated by reference into the final stipulations. Thus, the terms of that letter cannot be considered as terms of the settlement.

ITT argues that a reference in its letter of February 24, 1987, to the fact that the draft stipulation submitted October 24, 1986, was then before the Tax Division for review, *see* JX E-1, serves to incorporate the terms of that draft stipulation into the terms of the settlement. While ITT contends that the February 24, 1987, letter thus modified the terms of the settlement offer prior to acceptance, the July 1, 1987, letter accepting the offer explicitly refers to "the proposed partial settlement ... set forth in a letter from Gerald T. Ford to you dated August 28, 1986." JX H-1. Thus, plaintiffs' argument on this point is not compelling. Further, as defendant points out, "unilateral statements of position uttered before an integrated contract is entered do not become part of a contract when the party arguing for their inclusion was unable to secure the adoption of the statements in the language of the contract." *Consolidated Gas Supply Corp. v. F.E.R.C.*, 745 F.2d 281, 289 n. 18 (4th Cir. 1984) (in context of construction of settlement agreement), *cert. denied*, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985).

Of the issues raised in the letter of July 22, 1987, letter, two—the Pennsylvania Glass litigation issue and the agreement to delay final determination of refund figures until the resolution of all issues—clearly became terms of the settlement. However, the same simply cannot be said of the sourcing issue, which was not set forth in the text of the letter, but was contained in the enclosed draft stipulations that were rejected by the government.

In sum, the documents that by express agreement of the parties constitute the terms of settlement do not support plaintiffs' contention that the resolution of the

872

sourcing issue in their favor was one of the terms. Accordingly, plaintiffs' motion must be denied, and defendant's motion is granted.

## CONCLUSION

Plaintiffs' motion for entry of judgment pursuant to settlement is denied.

Defendant's motion for an order construing and enforcing stipulations for partial dismissal is granted in its entirety.

SO ORDERED.